IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CODY J. DENNIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-0828-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Cody Dennis seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to include in the residual functional capacity assessment plaintiff's inability to be left alone and the fact that plaintiff's medications would "further hamper" his performance at a work site or in training, and (2) failing to utilize the services of a vocational expert at step five. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On December 6, 2010, plaintiff applied for disability benefits alleging that he had been disabled since September 14, 2008. Plaintiff turned 18 years of age in July 2009; therefore, plaintiff's alleged onset date was considered to be his 18th birthday. Plaintiff's disability stems from headaches and a seizure disorder. Plaintiff's application was denied initially on March 25, 2011, and on reconsideration on April 20, 2011. On May 4, 2012, a hearing was held before an Administrative Law Judge. On May 14, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On July 10, 2013, the Appeals Council denied

plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

    2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

    3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

    4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.    THE RECORD

The record consists plaintiff's testimony and documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff has earned the following income:

| | |
|---|---|
| 2008 | $ 1,835.81 |
| 2009 | 2,371.16 |
| 2010 | 189.66 |
| 2011 | 0.00 |
| 2012 | 0.00 |

(Tr. at 126, 140).

### Work Activities Questionnaire

In a Work Activities Questionnaire completed by plaintiff's former employer, Snow Creek, on April 15, 2011, it was revealed that plaintiff had "many write ups for missing work or not showing up. Was terminated because of this." (Tr. at 142-144).  The Human Resources Manager indicated that plaintiff had never worked a full-time schedule, that he "never showed up for work or showed up late" and that he was involuntarily terminated.  Snow Creek would not rehire plaintiff due to "too many write ups."

**Disability Report**

In a disability report dated December 6, 2010, plaintiff reported that he was 5' 9" tall and weighed 260 pounds (Tr. at 148-154, 172). He was unable to work due to headaches and seizures. He stopped working on November 20, 2009 "because of my condition". Plaintiff reported that he did not attend special education classes (Tr. at 150).

**Disability Report - Appeal**

In an undated Disability Report - Appeal, plaintiff reported that he had had three seizures and "tons" of headaches (Tr. at 173). This change had occurred in February 2011 (Tr. at 173).

**Function Report - Third Party**

On April 11, 2011, plaintiff's mother, Patricia Dennis, completed a third party function report (Tr. at 179-186). She described his day as follows: "Cody will get up and help me do house work like laundry, do dishes, sweep floors, and play his X Box 360 [unless] Cody has a head ache then he will stay in bed and sleep." He cares for his one-month old baby boy and his pets (four dogs and a hamster). When asked what he was able to do prior to his condition that he can no longer do, Ms. Dennis wrote, "Cody was able to work and now he can't do that." She reported that plaintiff has no difficulty with personal care, and he needs no reminders to take care of his personal needs or to take medication. He prepares dinner about once a month which is consistent with his cooking habits prior to his alleged onset date. He is able to do laundry for about 2 hours, mow for about 3 hours, and sweep the floors for about a half an hour. Plaintiff loves being outside, he is able to shop in stores for food, and he can pay bills and count change. He watches television and he plays video games every day. He spends time with others "often" by visiting in person or talking on the phone. He goes to stores and

people's houses "often". When asked to describe any changes in social activities since plaintiff's condition began, Ms. Dennis wrote, "Cody can't do things like he use[d] to."

She reported that his condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, complete tasks, understand and use his hands. When asked to explain how his condition affects these abilities, Ms. Dennis wrote, "No more [than] 8 hrs and lifting no more [than] 30 pounds." His condition does not affect his ability to talk, concentrate, follow instructions, or get along with others. He finishes what he starts, he can follow written and verbal instructions "very well," he gets along with authority figures "great," but he cannot handle stress or changes in routine very well.

**Third Party Seizure Questionnaire**

In an April 7, 2011, seizure questionnaire completed by defendant's father, Douglas Dennis, it was reported that plaintiff has seizures 3 times per week (Tr. at 187-188). Mr. Dennis stated that seizures are caused when plaintiff "starts getting headaches that put him to sleep" or they just come on without plaintiff doing anything in particular. When plaintiff gets a seizure, his head drops, his eyes roll back in his head, and when he comes to he does not remember anything. After a seizure, plaintiff has a headache and he wants to sleep for 3 to 4 hours. Mr. Dennis stated, "It is hard for him to have a job because even when he was in school and got one, he would have to lay his head down and close his eyes. Then he would get in trouble for sleeping in class."

**Seizure Questionnaire**

In a seizure questionnaire completed by plaintiff in April 7, 2011, he reported that he gets seizures 3 times per month, that he has always experienced them with this frequency, and that his last one was in February 2011 (Tr. at 189-192). He gets them without warning. He passes out, his eyes roll back in his head, and afterwards he does not remember anything. They

last about 5 minutes.  Afterward he experiences confusion, fatigue and a headache.   Plaintiff

reported that he was taking his medication (Carbamazepine) as directed.  His parents and

fiancée had witnessed him having a seizure.  He concluded with, "My doctor told me no matter

what I shouldn't be left alone."  He recorded his seizures as having occurred on the following

dates:

| | |
|---|---|
| Monday, February 23, 2009 | The medical records show that plaintiff did go to the emergency room this day complaining of having had a seizure. |
| Wednesday, March 18, 2009 | The medical records show that on this day plaintiff saw his neurologist for a follow up and did not report having had a seizure. |
| Monday, August 9, 2009 | There are no medical records dated August 9, 2009.  However, on August 12, 2009 (three days later), he saw his neurologist for a follow up and specifically denied seizures and said he was doing well. |
| Thursday, September 18, 2009 | The medical records show that plaintiff went to the emergency room on this day complaining of knee pain after having jumped over a trash can and fallen, landing on his knee.  He specifically denied seizures. |
| Saturday, October 17, 2009 | There are no medical records for this date.  However, on November 11, 2009, less than a month later, plaintiff saw his neurologist for a follow up and denied seizures. |
| Tuesday, November 24, 2009 | There are no medical records for this date.  However, plaintiff went to Atchison Hospital on November 29, 2009, for an earache and did not mention having had a seizure 5 days earlier.  On December 3, 2009, he saw Dr. Sinclair for an earache and did not mention having had a seizure 8 days earlier. |

| | |
|---|---|
| Wednesday, December 16, 2009 | There are no medical records dated December 16, 2009.  On January 7, 2010, plaintiff went to the hospital concerned about frostbite,  and on January 14, 2010, he went to the hospital for cold symptoms.  On the first visit he did not mention seizures and on the second he specifically denied seizures. |
| Saturday, February 12, 2011 | There are no medical records for this date.  Although in connection with his disability case plaintiff alleged having had a seizure in February 2011, on July 13, 2011, plaintiff saw his neurologist for a follow up and said he had had a seizure the week before but had not had any seizures since his last visit with her on January 12, 2011. |

(Tr. at 191).  There are no seizures recorded in this seizure questionnaire for the 14-month period between December 16, 2009, and February 12, 2011.

## Migraine Headache Questionnaire

In a migraine headache questionnaire dated April 11, 2011, plaintiff reported that he gets migraine headaches 7 times per week and his last one was the day before (Tr. at 192-193).  He has always suffered from migraines of this frequency.  He reported that he had been to a hospital or emergency room during a migraine three times in the past year.  (In fact the medical records show that plaintiff went to Atchison Hospital five times during all of 2010 but never for a migraine.  Once was for suspected frostbite, 3 times for cold symptoms, and once when he swallowed a foreign body.  There are no records in 2011 prior to April 11 showing that plaintiff went to the hospital for any kind of headache.)

Plaintiff reported that his migraines last all day.  He gets blurry vision and wants to sleep a lot.  Sleep relieves the pain.  He take Carbamazepine for his migraines (this is the same medication plaintiff listed as having been prescribed for seizures).  He is taking his medication as directed.

**Function Report**

      In a Function Report dated April 11, 2011, plaintiff was asked how his condition limits his ability to work (Tr. at 199-206). He responded that the heat will give him a headache, he "can't be left alone," he cannot use heavy machinery, he cannot work more than 8 hours a week, and he gets too hot and has seizures. He spends his day cleaning, watching television, playing games, taking care of his son, and helping his parents. He feeds his son and changes his diapers. He feeds, waters, and walks his pets. When asked what he was able to do before his condition that he can no longer do, he wrote, "work" even though his earnings record shows that he has worked very little during his lifetime. He has no problems with personal care. He needs no special reminders for anything. He cooks once a month which is the same frequency as before his alleged onset date. He does laundry, sweeps floors, and mows the lawn. He can do laundry for 2 hours, mow for 3 hours, and sweep for 30 minutes. He goes outside every day either walking or riding in cars. He cannot go out alone because of seizures, headaches, and "doctor's orders." He is able to shop in stores 3 times a week. He watches television and plays video games "often and very well." He spends time with others "often," talking and hanging out. He goes to stores and other people's houses "often, a lot." He has no problems getting along with others. When asked to describe any changes in social activities since his condition began, he wrote, "Can't do stuff as long as I use[d] to anymore."

      His condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, complete tasks, understand and use his hands because he cannot do these things for more than 8 hours and cannot lift more than 30 pounds. His condition does not affect his ability to talk, remember, concentrate, follow instructions or get along with others. He follows written and oral instructions very well. He gets along with authority figures

"great." He has some trouble with stress and changes in routine. His medication causes him to be drowsy.

**Daily Activities Questionnaire - Third Party**

Plaintiff's father completed a daily activities questionnaire on April 21, 2011 (Tr. at 211-214). Plaintiff spends his day helping take care of his baby, helping around the house, watching television and playing X-Box. Plaintiff's meals are prepared by his parents because of the heat from the stove. Plaintiff will sometimes use a microwave and he mostly eats sandwiches and chips. When asked how often plaintiff visits with family or friends, Mr. Dennis wrote, "Only when we go, then he will go with us." When asked how often plaintiff attends movies, concerts or other entertainment activities, Mr. Dennis wrote, "Often, but with friends or family." He was unable to identify specifically any social activities that had changed since plaintiff's condition began -- "With the headaches and seizures he [has,] it [is] very hard to do the things he did before." Mr. Dennis ended with stating that if plaintiff could get on disability, some of the pressure would be off him to provide for his son (Tr. at 214).

**Daily Activities Questionnaire - Third Party**

In a daily activities questionnaire completed on April 21, 2011, by plaintiff's mother, it was reported that plaintiff helps clean the house, feeds his dogs, plays his X-Box 360, and plays with his son. Plaintiff takes care of his son and his pets. He goes to movies, concerts and other entertainment activities "often with friends and family." He cannot concentrate on tasks.

**Daily Activities Questionnaire - Third Party**

In a daily activities questionnaire completed on April 21, 2011, Tasha Ellis, plaintiff's girl friend, stated that plaintiff stays inside a lot and takes care of his son, cleans, watches television and plays his X-Box (Tr. at 219-222). When he goes to sleep, seizures wake him up. His parents cook for him because "excessive heat . . . causes him to pass out." Plaintiff gets

dizzy when he bends over. He goes out "every now and then." Ms. Ellis said that plaintiff's hobbies include video games, basketball, spending time with his son, and watching television. Plaintiff visits with family and friends "very often." Plaintiff feeds, changes and bathes his son. He attends movies, concerts or other entertainment activities "often with friends and family." When asked to describe how plaintiff's social activities had changed since his condition began, Ms. Ellis did not specify anything -- she stated only that plaintiff cannot do the things he used to do because of his seizures and passing out.

Ms. Ellis reported that plaintiff cannot concentrate on "1 thing at a time" anymore because of his headaches. She also stated that he "has depression because he can't work like he use[d] to and it eats at him because he was taught to work."

**Disability Report - Appeal**

In an undated disability report, plaintiff stated that his condition had worsened since his last disability report which was dated April 5, 2011 (Tr. at 225-230). He was now limited from "walking or jobbing [sic] or running or sitting for long periods of time like I used to. If I get too hot I pass out. If I sit too long my eyes get blurry and then it sets me off into a seizure." He reported pain in his shoulders, fatigue, lack of concentration, and sleeping problems because he has seizures in his sleep and wakes up suddenly.

Plaintiff stated that he may not get dressed until later in the day because of fatigue. He does not take a shower on the day after he has a seizure or migraine because he is afraid he will fall in the shower. All he does is lie on the couch and rest all day and all night. He stays in the house every day because he has a migraine headache or suffers from a seizure every day. The rest of his family cooks and cleans. He tries to help out when he feels good. His fatigue is too great for him to read. He does not visit with friends or family outside the home.

11

**B.**     *SUMMARY OF MEDICAL RECORDS*

On January 9, 2008, plaintiff completed an application for Special Olympics (Tr. at 409-411). He weighed 244 pounds. In his health history, he denied seizures/epilepsy/ fainting spells, he denied concussion or serious head injury, he denied heat stroke/exhaustion, he denied hearing loss, he denied emotional/psychiatric/behavioral problems. He was on no medications. He denied smoking or drinking alcohol. His primary category was: " 'slow learner' - Father ". Plaintiff's father stated that he was a slow learner in speech class at Atchison High School. Aaron Sinclair, M.D., performed the examination for permission to participate as an athlete. He found no restrictions.

On April 15, 2008, plaintiff had a head CT (Tr. at 427). He complained of a headache after falling and hitting his head. The CT scan was normal.

September 14, 2008, is plaintiff's alleged onset date.

On January 10, 2009, plaintiff had x-rays of his left shoulder due to pain from trauma (Tr. at 426). No fracture or dislocation was found.

On February 23, 2009, plaintiff was seen at the emergency room after experiencing a seizure (Tr. at 259-270, 282-283). "Pt states he has had seizures in the past, pt states he bumped his head when he fell to the concrete floor." Plaintiff was 17 at the time. The record states that someone had been with him and witnessed the seizure. "Prior etiology: had similar event 1 year ago and was dx migraine." Plaintiff had a mild headache. His level of consciousness was within normal limits. He had no psychiatric symptoms. Plaintiff was examined and everything was noted to be normal except he had occipital swelling and tenderness (i.e., on the back lower part of the skull). A CT of his head was normal except he was noted to have chronic sinusitis (sinus infection). Plaintiff was discharged to home in stable condition, he was told not to go to school or perform sports for one or two days.

12

The following day, on February 24, 2009, plaintiff saw Mignon Makos, M.D., a neurologist (Tr. at 292). Plaintiff said he went to bed normally on the evening of February 22 and woke up unable to breathe well. His head was spinning. He said he used the bathroom and then lost consciousness and hit the concrete floor of the bathroom. "His father heard the fall and went in. He found him lying on the floor and 'jerking all over.' It lasted 2 minutes. He was not incontinent nor did he bite his tongue." Plaintiff reported having had a similar incident at school a year earlier. During lunch he suddenly could not breathe well. He "spaced out" and then fell over and hit the back of his head. "He was seen quivering like he did have a seizure. Again, there was no tongue biting or incontinence of urine. He was seen in Atchison ER. The family understood that the seizure was caused by migraine." He reported a medical history of migraine headaches, Bell's Palsy,[1] and partial seizures. The record ends after the social history. It is not clear whether part of the record was not included by the neurologist's office or no treatment was provided on this day; however, it is apparent that brain scans were ordered and Tegretol (also called Carbamazepine) was prescribed due to notations in upcoming medical records.

The next day, on February 25, 2009, plaintiff had an EEG during wake and sleep (Tr. at 255-257, 275-278). Dr. Makos found that plaintiff's EEG was "mildly abnormal" suggesting that plaintiff was "at risk for partial seizures. As always, clinical correlation is advised."

---

[1]"Bell's palsy causes sudden weakness in your facial muscles. This makes half of your face appear to droop. Your smile is one-sided, and your eye on that side resists closing. Bell's palsy, also known as facial palsy, can occur at any age. The exact cause is unknown, but it's believed to be the result of swelling and inflammation of the nerve that controls the muscles on one side of your face. It may be a reaction that occurs after a viral infection. For most people, Bell's palsy is temporary. Symptoms usually start to improve within a few weeks, with complete recovery in about six months. A small number of people continue to have some Bell's palsy symptoms for life."
http://www.mayoclinic.org/diseases-conditions/bells-palsy/basics/definition/con-20020529

On February 28, 2009, plaintiff had a normal MRI of his brain (Tr. at 253-254, 280-281).

On March 18, 2009, plaintiff saw Dr. Makos for a follow up (Tr. at 290-291). Plaintiff denied fatigue, blurred vision, double vision, visual loss, hearing loss, ringing in the ears, spinning sensation, sinus pain, neck pain, muscle weakness, decreased memory, difficulty speaking, dizziness, incoordination, loss of consciousness, syncope, tremor, unsteadiness, changes in sleep pattern, and inability to concentrate. Plaintiff weighed 251 pounds. He was observed to be alert, cooperative and well groomed with a happy and stable affect, normal speech, normal gait, a normal mental status exam, normal coordination, and full range of motion in all joints. He was assessed with migraine unspecified, epilepsy unspecified, and Bell's palsy. The MRI and EEG were discussed with plaintiff and his father. Tegretol was continued at the same dosage.

On April 9, 2009, plaintiff saw Dr. Makos for a follow up on an abnormal EEG with a normal MRI of the brain (Tr. at 288-289). Plaintiff was 17 at the time. "He has had no seizures since his last visit. He continues to attend the alternative school. His grades are better. He is no longer sleeping in class. He is not seeing a counselor." Plaintiff weighed 253 pounds. He was observed to be alert, cooperative and well groomed. His affect was happy and stable, his speech was normal. He had a normal gait, full range of motion in all joints, his mental status exam was normal. He was assessed with unspecified migraine and unspecified epilepsy. He was prescribed Tegretol. There was a note that his recent Tegretol level was 10 "but he has gained weight since this level. We discussed exercise and better food choices." He was told to return in 4 months. "I have asked the patient to lose the sodas. I have asked the father to find a counselor for some life coaching."

On April 23, 2009, plaintiff saw Dr. Sinclair and was assessed with poison ivy after having cleaned a yard and pulled weeds (Tr. at 407).

On May 4, 2009, plaintiff saw Dr. Sinclair with complaints of nausea and vomiting with headache and possible fever (Tr. at 405). Plaintiff had stomach pain. Plaintiff was observed to be pleasant and cooperative. His exam was normal except abdominal tenderness. He was assessed with gastroenteritis and was given Phenergan (anti-nausea medication).

On May 13, 2009, plaintiff had x-rays of his right hand after complaining of pain due to hitting a wall (Tr. at 425). The x-rays show soft tissue swelling but no fracture.

Due to his age, plaintiff's earliest possible date for receipt of disability benefits is July 1, 2009.

On August 12, 2009, plaintiff saw Dr. Makos for a follow up (Tr. at 286-287, 441-442). "At the time of his last visit, the recent Tegretol level was 10 but he had gained weight since this level. We discussed exercise and better food choices. I had asked the patient to lose the sodas. I had asked the father to find a counselor for some life coaching. He has been doing OK. SRS [Kansas Social Rehabilitation Services] decided not to pursue taking him away. He is not yet in counseling. There have been a few headaches. With the first one, he had to go to bed. It lasted two hours and he did not vomit. 'The last medication you put him on seems to work better than the other one.'" Plaintiff denied fatigue, blurred vision, double vision, visual disturbances, visual loss, hearing loss, ear pain, earache, ringing in the ears, neck pain, fainting, blacking out, muscle weakness, difficulty speaking, dizziness, fainting, incoordination, loss of consciousness, seizures, syncope, spinning sensation, tremor, unusual sensation, unsteadiness, weakness, and changes in sleep pattern. Plaintiff weighed 260 pounds. He was observed to be alert, cooperative, well groomed, oriented times four, well nourished and well developed with normal posture and normal gait. His physical exam was normal except he was

noted to have a scarred right ear. He was observed to have a happy and stable affect, normal speech, a normal mental status exam, normal coordination, and full range of motion in all joints. He was assessed with migraine unspecified, epilepsy unspecified, and Bell's palsy. "He is doing well. We discussed the importance of diet and exercise. The Tegretol will be continued but the dosage increased. A level will be rechecked in 3 months."

On August 21, 2009, plaintiff went to Atchison Hospital complaining of the "worst headache of his life" (Tr. at 301, 362-369, 415-417, 424). Plaintiff denied seizures. During the review of symptoms, plaintiff reported "recent stress - death in family, dog died." Plaintiff was listed as a smoker. Dr. Makos was consulted via telephone by the emergency room staff. Plaintiff had a CT scan of his head which was compared to his last one taken on April 15, 2008, and no change was found. The CT scan was normal. He was assessed with chronic headache disorder. His blood work showed that the level of Tegretol in his blood was slightly high (12.9, the desired range was 4.0 to 12.0). He was told to decrease his Tegretol and start on Depakote.

On September 18, 2009, plaintiff went to Atchison Hospital for knee pain (Tr. at 355-361, 423). He said he jumped over a trash can the day before and fell, hitting his knee on the pavement. Plaintiff weighed 262 pounds. He was listed as a current smoker. He was able to walk to the exam room. Plaintiff denied headache, dizziness, seizure, numbness or weakness. X-rays showed no fracture or dislocation, only soft tissue swelling. Plaintiff was assessed with left knee sprain and was told to use crutches for 2 to 3 days.

On October 7, 2009, plaintiff went to Atchison Hospital complaining of a sore throat and cough for the past three weeks (Tr. at 348-354, 414). He reported smoking a half pack of cigarettes per day and reported having headaches but denied dizziness, seizures, numbness or

weakness. He was assessed with bronchitis and prescribed an antibiotic. In very large font, all caps, and emboldened are the words, "STOP SMOKING".

On November 11, 2009, plaintiff saw Dr. Makos for a follow up (Tr. at 284-285, 439-440). "At the time of his last visit, he was doing well. We discussed the importance of diet and exercise." Plaintiff reported having headaches but "they are lighter than they were. School is going better. His grades are better." Plaintiff denied fatigue, blurred vision, double vision, visual disturbances, hearing loss, deafness, decreased hearing, ear pain, earache, and ringing in the ears. He denied neck pain or stiffness, fainting, blacking out, muscle weakness, dizziness, fainting, incoordination, loss of consciousness, seizures, syncope, spinning sensation, tremor, unusual sensations, unsteadiness, changes in sleep pattern and changes in appetite. He did report headaches. Plaintiff weighed 260 pounds. He was 18. On exam plaintiff was found to be alert, cooperative, well groomed, oriented times four, well nourished and well developed with a normal posture and normal gait. The rest of his physical exam was normal except that his right ear was noted to be scarred. He was observed to have a happy and stable affect with normal speech. His mental status exam was completely normal, his hearing was normal, his eye movements were normal, reflexes were normal. His coordination was normal. He could tandem walk, walk on his toes and walk on his heels. His gait was normal. He had full range of motion in all joints. He was assessed with unspecified migraine and unspecified epilepsy. He was prescribed Tegretol, 200 mg twice in the morning, once at midday, and twice at bedtime. He was given 12 refills. He was also assessed with Bell's Palsy. "He is doing well. No medication changes have been made." Plaintiff was told to return in six months.

On November 13, 2009, plaintiff was seen by Michael Jones, M.D., after an air horn blew off by his ear and he was unable to hear out of the ear (Tr. at 403-404). Plaintiff had scarring in his right ear due to previously having tubes in his ears. Dr. Jones prescribed

Allegra (allergy medication) and Amoxil (antibiotic). "Someone is going to see him back in 7 to 10 days and recheck his hearing."

On November 29, 2009, plaintiff went to Atchison Hospital complaining of an earache for the past three weeks (Tr. at 341-347). Plaintiff reported being a current smoker and a social drinker. He reported occasional dizziness over the past week. Plaintiff was treated by Dr. Sinclair. His physical exam was normal except his left eardrum was red. He was assessed with an ear infection. Plaintiff was told to stop smoking and he was given an antibiotic.

On December 3, 2009, plaintiff saw Dr. Sinclair for a follow up (Tr. at 401-402). Plaintiff said he had to leave school today due to continuing ear pain. "He does smoke, and I have encouraged him to quit. Nothing else seems to help." He was diagnosed with an ear infection in the right ear. Dr. Sinclair prescribed Prednisone (a steroid), an antibiotic, and Lortab for pain.

On January 7, 2010, plaintiff went to Atchison Hospital and complained of redness on both his lower legs (Tr. at 335-340). He thought it might be frostbite since he walked in the cold weather in shorts for about 45 minutes. Plaintiff reported smoking a pack of cigarettes per day for the past two years. Plaintiff's father reported that plaintiff wears shorts all the time. Patchy redness was observed on both legs. He was assessed with frostnip of lower legs. He was given a prescriptions for pain and a cream to use in case his skin were to split.

On January 14, 2010, plaintiff went to Atchison Hospital and complained of cough, runny nose, sore throat, fever and headache (Tr. at 327-334, 413). He reported smoking a half a pack of cigarettes per day. He denied dizziness, seizure, numbness and weakness. A strep screen was negative. His physical exam was normal. He was assessed with bronchitis and was given a prescription for an antibiotic.

On February 17, 2010, plaintiff went to Atchison Hospital and complained of cough, shortness of breath when walking, and running nose (Tr. at 317-326, 422).  He reported smoking a pack of cigarettes per day for the past six years.  He weighed 260 pounds.  He denied dizziness, headache, seizure, numbness and weakness.  His physical exam was normal except for wheezing.  Chest x-rays were normal.  He was diagnosed with bronchitis and was given an antibiotic and Albuterol inhaler, and he was told to use Tylenol and over-the-counter cough medicine.

On June 16, 2010, plaintiff went to Atchison Hospital and had an x-ray of his neck due to having swallowed a "foreign body" (Tr. at 298, 310-316, 421).  Plaintiff said he swallowed the metal ball from his tongue piercing and thought it was stuck in his throat.  Plaintiff reported having smoked a half a pack of cigarettes per day for the past six years.  His physical exam was normal.  The x-rays were normal.  He was having no difficulty swallowing in the emergency room.  He was discharged with no treatment.

On November 27, 2010, plaintiff went to Atchison Hospital and complained of cold symptoms (Tr. at 307).  Plaintiff said he had never smoked.  He denied all symptoms except sinus congestion, coughing, wheezing, and myalgias.  Plaintiff was assessed with bronchitis and sinus infection.

On December 6, 2010, plaintiff applied for disability benefits.

On December 29, 2010, plaintiff saw Aaron Sinclair, M.D. (Tr. at 398-400).  His chief complaint was "paperwork".  "Cody Dennis here for paperwork for SRS [Kansas Department of Social Rehabilitative Services], Voc Rehab."  Plaintiff reported smoking a pack of cigarettes a day with no intention of quitting.  He reported no alcohol use.  He said he was having daily headaches which are sometimes accompanied by nausea but no vomiting.  "Doesn't seem to have a great sleep/wake cycle.  He is awake a lot at night. . . .  He has a seizure disorder in

which he used to use Tegretol and after much probing, has not actually taken that since 2009. He has about three to four seizures about every three to six months, but otherwise seems to be pretty well controlled when he is on the medicine. Seen Dr. Makos in the past, but has not seen [her] in quite some time." Plaintiff was observed to be alert, pleasant and cooperative. His physical exam was normal. Dr. Sinclair recommended getting back on Tegretol. He prescribed 200 mg twice a day with a goal of gradually increasing to 400 mg twice a day. Dr. Sinclair completed paperwork finding that plaintiff's seizure disorder and severe headaches do not prevent gainful employment or limit gainful employment ("in some areas may not be suited for an individual with a seizure disorder"). He found that plaintiff can work for 8 hours per day, stand for 8 hours per day, sit for 8 hours per day, and can lift a maximum of 30 pounds. He found that plaintiff would have no difficulty dealing with the public. When asked what specific accommodations were needed, Dr. Sinclair wrote, "should not be left alone." He indicated that plaintiff was taking medications which would hinder his performance at a work site or in a training class. Finally, he recommended a neurology evaluation.

On January 12, 2011, plaintiff saw Aaron Sinclair, M.D., for a follow up on headaches and seizures (Tr. at 395-397). He weighed 288 pounds. He continued to take Tegretol. He was smoking a pack of cigarettes per day and was not considering quitting. He reported no alcohol use. "He hasn't had a seizure in a month. He was having up to six a month. He is tolerating his medicines well". Plaintiff's headaches had "decreased traumatically in half" on the Tegretol 200 mg twice a day. He reported daily headaches, anxiety, facial pain, fatigue, seizures and vertigo. He denied confusion, depression, incoordination, loss of consciousness, memory problems, muscle weakness, sleep disturbances, slurred speech, or any other symptom. Plaintiff was noted to be alert, pleasant and cooperative. His neurological exam was unremarkable. His Tegretol dose was increased to see if his headaches would improve.

Later that morning, plaintiff saw Dr. Makos for a follow up (Tr. at 437-438). "This is a 19-year-old gentleman who was seen in followup after a long absence. He was last evaluated in St. Joseph in November of 2009 for partial seizures with and without secondary generalization complicated by headaches. He was on carbamazepine (Tegretol) [five times a day]. He went off the medication for about two weeks and then resumed the medication last week. Dr. Sinclair has outlined a titration schedule. He's had no recurrent seizures." Plaintiff had a normal exam, including normal muscle strength, muscle tone and bulk. Plaintiff's weight (288 pounds) had gone up, so Dr. Makos indicated he would likely need an increase of his Tegretol. She asked him to have his blood checked and to return in six months.

On January 19, 2011, plaintiff went to Atchison Hospital and complained of an earache and nasal symptoms (Tr. at 304-306). A strep screen was positive and he was prescribed antibiotics.

On March 5, 2011, plaintiff was seen by Shawn Morrow, D.O., in connection with his application for disability benefits (Tr. at 376-378). Plaintiff reported a three-year history of seizures with his last one occurring in February 2011. "He reports post-ictal lethargy and loss of consciousness. He stares into space and reports loss of urine." Dr. Morrow noted that plaintiff's EEG was only mildly abnormal, MRI was normal, MR angiography of the brain was normal. Plaintiff reported a three-year history of headaches occurring three to four times a week. Headaches are associated with nausea and vomiting. "No medications were brought today. The patient has been to the ER one to two times in the past year for injections of Demerol." Plaintiff reported smoking a pack of cigarettes per day for the past four years. He drinks alcohol occasionally. His hobbies include playing sports and playing video games. Plaintiff was noted to be cooperative throughout the exam. He was able to hear conversational speech without limitation. Plaintiff weighed 290 pounds. His physical exam was normal. No

disorientation was noted.  Plaintiff had no difficulty getting on and off the examining table.  He

had no difficulty with heel and toe walking, no difficulty squatting and arising from the sitting

position.  He had mild difficulty hopping.  Plaintiff reported that despite taking

Carbamazepine, he was still having a seizure once a month.  Dr. Morrow assessed seizures.  He

did not assess any of plaintiff's functional abilities.

On March 23, 2011, Navjeet Singh, M.D., completed a Physical Residual Functional

Capacity Assessment (Tr. at 379-384).  Dr. Singh assessed seizure disorder and headaches but

found no exertional limitations, no manipulative limitations, and no visual limitations.  She

found that plaintiff had no environmental limitations except that he should avoid even

moderate exposure to hazards such as machinery and heights.  She found that plaintiff could

never climb ladders, ropes and scaffolds; that he could occasionally crouch and crawl; and that

he could frequently climb ramps and stairs, balance, stoop and kneel.

On May 19, 2011, plaintiff saw Dr. Sinclair (Tr. at 393-394).  The chief complaint was

listed as "seizure, disability paperwork discussion."  Plaintiff weighed 292 pounds.  He was

taking Carbamazepine (Tegretol) but no other medications.  Plaintiff continued to smoke a

pack of cigarettes per day and he was not considering quitting.  He reported no use of alcohol.

Plaintiff reported having 3 to 4 seizures per six-month period.  Dr. Sinclair assessed complex

partial seizures and completed plaintiff's disability paperwork.

On July 13, 2011, plaintiff saw Dr. Makos for a follow up (Tr. at 432).  The last time he

had seen her was January 12, 2011 (six months earlier).  Plaintiff said the week before he was

mowing the lawn, it got too hot, and he had a seizure.  "He claims this is his first episode since

his last appointment."  Plaintiff described not being able to hear anything for 25 minutes and

having twitching eyes, but he had no loss of consciousness, no incontinence of urine, and no

tongue biting.  Plaintiff weighed 288 pounds.  Plaintiff had normal strength in all extremities

and was able to ambulate unassisted.  Although plaintiff listed Tegretol as a current medication, he "admitted that there have been times that he has missed the medication."  Dr. Makos prescribed Tegretol.

Shortly before midnight on November 25, 2011, plaintiff went to Atchison Hospital and reported that he had fallen in the tub striking the back of his head and "possibly having [a] seizure."  (Tr. at 450-458).  "[U]nknown if pt experienced seizure at time of fall."  This had happened 30 minutes earlier, and plaintiff arrived at the hospital walking, he was alert and oriented, able to communicate, and he was able to obey commands.  He weighed 293 pounds.  He reported smoking a half a pack of cigarettes per day for the past six years.  His physical exam was normal.  He had a head CT done which showed "no acute intracranial abnormality" (Tr. at 448).  Although he said he was taking Tegretol, he had blood work done and his Tegretol level was 0.1 which was noted to be low (Tr. at 447).  The desired range was 4.0 to 12.0.  "He initially told me he had been taking the Rx regularly, however when his tegretol level came back this PM, he said that he has forgotten to take it the past 3 days.  The fiancé didn't mention seeing any seizure activity before or after the pt struck his head."  He was noted as not compliant with seizure medication.  Plaintiff said his last seizure was six months ago.  "He thinks he doesn't feel tonight like he normally does after he has a seizure.  He denies a headache now and his confusion has resolved." Robert Turner, M.D., noted, "No recurrent seizure here.  Pt remained alert with normal gait and sensorium in the ER."  Dr. Turner discussed with plaintiff the need to take his medication on a regular schedule to maintain adequate blood levels.  He assessed plaintiff with a concussion, told him to take over-the-counter Tylenol and Motrin for pain, and discharged him the morning of November 26, 2011, in "good condition."

The next day, shortly before midnight, plaintiff went to Atchison Hospital and reported having a headache and "have been sleeping all day" (Tr. at 462-469). He was noted to be alert, oriented and cooperative. His mood was appropriate. He had a CT scan of his head which was normal except for mild sinus infection (Tr. at 460). Plaintiff was given an injection of Toradol. His blood work showed that his Tegretol level was slightly high (12.6, the desired range is 4.0 to 12.0). Plaintiff was told to cut his dose of Tegretol in half for 2 days and then resume his normal dose and to follow up with his treating doctor in 1 to 2 days. He was told he would need close monitoring of his Tegretol levels.

On November 28, 2011, plaintiff saw Dr. Makos for a follow up (Tr. at 479-481). "At the time of his last visit, he was doing well. Plaintiff is being seen sooner than anticipated today as he had a seizure on 11/25/11 after stopping his Tegretol 2 months ago. He went to the ER and his Tegretol level was 0.1. He resumed the Tegretol at 400 mg [five times a day] following which the Tegretol level went up to 12.8." Plaintiff said that before November 25, 2011, his last seizure had been six months earlier while he was taking Tegretol. He said that Tegretol caused headaches and that when he stopped taking the Tegretol, his headaches went away. "He is done with school and is going to the Atchison work center. He is looking for work." Plaintiff continued to smoke. He denied double vision, ear pain, ringing in the ears, fainting, blacking out, muscle weakness. He reported dizziness (feeling off balance) and weakness in his legs "since last Wednesday." He also reported sleeping a lot. Plaintiff was observed to be alert, cooperative, well groomed, oriented times four with a normal posture and normal gait. His physical exam was normal except a scar on his right ear. His affect was happy and stable, his speech was normal. He had full range of motion in all joints. He was assessed with epilepsy unspecified and migraine unspecified. Dr. Makos discontinued Tegretol and started plaintiff on Levetiracetam and told him to return in 2 months.

*C.*     *SUMMARY OF TESTIMONY*

During the May 4, 2012 hearing, plaintiff testified as follows.

At the time of the hearing, plaintiff was 20 years of age (Tr. at 28).  His last job was at Snow Creek ski resort where he shoveled snow and pushed people down the middle of the tube (Tr. at 28).  He lost that job because he got too hot and passed out, so he was fired (Tr. at 28).  When he gets too hot, he passes out and if he passes out long enough he will be thrown into a seizure (Tr. at 29).  Plaintiff also worked at Benedictine College as a custodian (Tr. at 29).  He got too hop mopping and passed out, so he was fired (Tr. at 29).  Those are the only two jobs he has ever had (Tr. at 29).  He has never tried to get a job other than those two jobs (Tr. at 34).

Plaintiff dropped out of Atchison High School and then went to a Christian Academy for home school (Tr. at 34).  The year before the hearing plaintiff finished high school (Tr. at 34).  He had mostly As and Bs but one F (Tr. at 35).

Plaintiff lives with his girl friend and his son (Tr. at 29).  He spends most of the day with his girl friend and son watching television (Tr. at 33).  His hobbies include going to the movies, hanging out with friends, and playing video games (Tr. at 33).  Plaintiff smokes about a half a pack of cigarettes per day (Tr. at 33).  He drinks alcohol every now and then (Tr. at 33).

Plaintiff suffers from migraine headaches that last an entire day (Tr. at 30).  He gets a migraine about every other day (Tr. at 30).  His headaches make him tired and he sleeps all day (Tr. at 30).  His medication helps sometimes (Tr. at 30).

Plaintiff has trouble with his right ear, but he was able to hear and understand the questioning during the administrative hearing (Tr. at 30).

Plaintiff has a seizure disorder for which he takes medication (Tr. at 30-31). Plaintiff was asked to describe a seizure: "They'll come up, I'll pull up these seizures, like, most of the time when I have a seizure and stuff, all I remember is, like, right before I have it. And then after I wake up from my seizure, I don't remember what happens in between." (Tr. at 31). After a seizure, it takes plaintiff about 30 minutes to recover (Tr. at 31). Plaintiff does not know how long his seizures last, but his dad told him that he had witnessed one that lasted about 15 minutes (Tr. at 31). Plaintiff has a seizure on average three or four times every six months (Tr. at 31). Plaintiff does not drive because every time he tries to get a license, he has a seizure and has to wait another six months (Tr. at 31-32).

Plaintiff participated in the Special Olympics, playing basketball, baseball and bowling (Tr. at 32). Plaintiff has Bell's Palsy and it was hard for him to read assignments in school (Tr. at 32). He would have to bend down and get as close to the paper as possible to see the words (Tr. at 32). He can read some words, others he cannot (Tr. at 32). He was in special education for speech (Tr. at 32). He had no other special education classes (Tr. at 34).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Robert Burbank entered his opinion on May 14, 2012 (Tr. at 10-18). Plaintiff's earliest possible onset date is July 1, 2009 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 12). He worked after this date but earned only $189.66 in the first quarter of 2010 which does not rise to the level of substantial gainful activity (Tr. at 12).

Step two. Plaintiff suffers from the following severe impairments: chronic headaches and a seizure disorder (Tr. at 12). Plaintiff's shoulder pain is not a severe impairment (Tr. at 12). There is no evidence supporting his alleged hearing loss (Tr. at 12-13). There is

26

insufficient evidence of any learning disability or mental impairment in cognitive functioning (Tr. at 13).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13).

Step four.  Plaintiff has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for 6 hours, and sit for 6 hours (Tr. at 13).  He cannot climb ladders, ropes or scaffolds, but he can occasionally crouch and crawl (Tr. at 13).  He must avoid even moderate exposure to hazardous conditions (Tr. at 13).  Plaintiff has no past relevant work (Tr. at 17).

Step five.  Since plaintiff retains the residual functional capacity to perform the full range of light work with the exception of additional limitations that have little or no effect on the occupational base of unskilled light work, he was found not disabled at the fifth step of the sequential analysis (Tr. at 18).  The inability to ascend or descend ladders and scaffolding is not significant, crouching and crawling are not required for the base of light exertional level work, and restrictions against unprotected elevations and proximity to dangerous, moving machinery are not significant at all exertional levels (Tr. at 18).

## VI.    FULL OPINION OF TREATING PHYSICIAN

Plaintiff argues that the ALJ erred in giving significant weight to the opinion of  Dr. Sinclair but failing to incorporate Dr. Sinclair's finding that plaintiff should not be left alone and that he was on medication that would hamper his performance at a work site or in a training class.  Plaintiff's argument is without merit.

Plaintiff cites SSR 96-8p in support of his argument that the ALJ erred in failing to include these limitations in his residual functional capacity.  SSR 96-8p states in relevant part as follows:

The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.

As SSR 96-8p is a lengthy ruling and plaintiff did not specify what part of this ruling supports his argument, I assume this is that part upon which he relies as there is nothing specific in that ruling requiring the ALJ to adopt all or none of a treating physician's opinion.

20 C.F.R. § 404.1527(a)(2) states that medical opinions are statements from physicians that reflect judgments about the nature and severity of a claimant's impairments, including the symptoms, diagnosis and prognosis, what the claimant can still do despite impairments, and the claimant's physical or mental restrictions. Section 404.1527(b) states that, "In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." Section 404.1527(c)(3) states, "The better an explanation a source provides for an opinion, the more weight we will give that opinion." Section 404.1527(c)(4) states, "Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Section 404.1527(c)(6) states, "When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion." Finally, § 404.1527(d) states that opinions which are "not medical opinions" will not be considered.

Plaintiff offers no legal authority for his argument that every single thing a treating physician says must either be accepted or rejected by the ALJ. In this case, the ALJ gave significant weight to the opinion of Dr. Sinclair. His statements that plaintiff should not be left

alone and is on medication that would hamper his performance at a work site are not medical

opinions. See 20 C.F.R. § 404.1527(d). Furthermore, even if they were medical opinions, the

ALJ would not be required to accept these opinions in formulating a residual functional

capacity. Dr. Sinclair provided no explanation for these findings, see § 404.1527(c)(3);

nothing about being left alone or medication side effects appears in any of Dr. Sinclair's

records (or any other records for that matter, other than an allegation sometime later than

Tegretol caused headaches), see § 404.1527(c)(4); and finally the fact that this opinion was

prepared for Vocational Rehabilitation and not for Social Security disability or for treatment

further supports the ALJ's failure to incorporate these restrictions into plaintiff's residual

functional capacity. Dr. Sinclair specifically found that plaintiff was capable of working 8

hours a day and that his symptoms "do not limit gainful employment."

　　　Plaintiff also points out that Dr. Sinclair restricted plaintiff from driving long distances

and operating heavy machinery. I note that (1) the ALJ's residual functional capacity

assessment included the restriction that "claimant must avoid even moderate exposure to

hazardous conditions" which includes (on all RFC forms) "machinery and heights", and (2)

plaintiff continued to operate a lawn mower for 3 hours at a time as reported not only in

medical records but repeatedly in administrative paperwork completed by plaintiff, his fiancée,

his mother, and his father. Therefore, his argument is significantly weakened had the ALJ not

chosen to include this restriction in the residual functional capacity assessment.

　　　The ALJ found that plaintiff can perform light work which is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted
> may be very little, a job is in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with some pushing and pulling of
> arm or leg controls. To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 416.967(b). The ALJ did not make a finding that plaintiff is capable of driving long

distances. He also did not make a finding that plaintiff is capable of performing a specific job that requires that he drive long distances. He specifically stated that plaintiff's "additional limitations have little or no effect on the occupational base of unskilled light work." As quoted above, light unskilled work does not require the ability to drive long distances.

## VII.   USE OF VOCATIONAL EXPERT

Plaintiff argues that the ALJ erred in failing to utilize the services of a vocational expert at step five. The ALJ explained his decision to rely on the Medical-Vocational Guidelines rather than on the testimony of a vocational expert:

> In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).
>
> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.20. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule. Specifically, the undersigned notes that the inability to ascend or descend ladders and scaffolding is not significant (SSR 83-14). Additionally, crouching and crawling are not required for the base of light exertional level work (SSRs 83-14; 85-15). Finally, restrictions against unprotected elevations and proximity to dangerous, moving machinery are not significant at all exertional levels (SSR 85-15).

(Tr. at 18).

20 C.F.R. § 416.969 provides that, "The rules in appendix 2 do not cover all possible variations of factors. Also, as we explain in § 200.00 of appendix 2, we do not apply these rules if one of the findings of fact about the person's vocational factors and residual functional

capacity is not the same as the corresponding criterion of a rule. In these instances, we give full consideration to all relevant facts in accordance with the definitions and discussions under vocational considerations. However, if the findings of fact made about all factors are the same as the rule, we use that rule to decide whether a person is disabled."

Medical-Vocational Rule 200.00 provides in relevant part, "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled. . . . Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled."

Plaintiff argues that because SSR 85-15 includes the words "solely nonexertional impairments" in its title, the ALJ erred in relying on this ruling in deciding to use the guidelines rather than a vocational expert. This argument is without merit. SSR 85-15 includes the following:

> The second issue is whether the person can be expected to make a vocational adjustment considering the interaction of his or her remaining occupational base with his or her age, education, and work experience. A decisionmaker must consider sections 404.1562-404.1568 and 416.962-416.968 of the regulations, section 204.00 of Appendix 2, and the table rules for specific case situations in Appendix 2. **If, despite the nonexertional impairment(s), an individual has a large potential occupational base, he or she would ordinarily not be found disabled** in the absence of extreme adversities in age, education, and work experience. (This principle is illustrated in rules 203.01, 203.02, and 203.10 and is set out in SSR 82-63, PPS-79, Medical-Vocational Profiles Showing an Inability to Make an Adjustment to Other Work.) The assistance of a vocational resource may be helpful. Whenever vocational resources are used and the decision is adverse to the claimant, the determination or decision will include: (1) citations of examples of occupations/jobs the person can do functionally and vocationally, and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country.

(emphasis added). Clearly the presence of nonexertional impairments does not always preclude the use of the Medical-Vocational Guidelines.

In this case, the ALJ specifically found that despite plaintiff's nonexertional impairments, he has a large potential occupational base. The few nonexertional impairments supported by the record do not significant erode the potential occupational base. The substantial evidence in the record as a whole supports this finding.

VIII.     *CONCLUSIONS*

A careful reading of the record establishes that plaintiff alleged seizures as frequently as six times a month, his description of the frequency of seizures varied widely from day to day and from doctor to doctor, and he actually sought medical care for a seizure on only one occasion -- February 23, 2009, which is before his alleged onset date. After that, he was prescribed Tegretol to prevent seizures. He took it only sporadically, and he lied to his doctors about even that. For example, on December 29, 2010, plaintiff admitted to his primary care physician that he had not taken Tegretol since sometime in 2009. A few days later he told his neurologist that he had only been off of it for 2 weeks. On occasion he claimed to be taking his medication as prescribed and admitted that was not true only after being confronted with blood work showing almost no Tegretol in his system. Plaintiff sought medical care a handful of times for headaches; however, the medical record certainly does not support the level of severity and frequency he claims in his disability paperwork and testimony. In fact he was seen for cold symptoms more often than he was seen for headaches.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 8, 2014